The State v. Bruce.

---

THE STATE v. BRUCE.

1. **Criminal Law : INSANITY.**    To entitle the defendant in a criminal case to an acquittal, it is only necessary that the jury should be reasonably satisfied he was insane.    If the weight or preponderance of evidence shows the insanity of the defendant, it raises a reasonable doubt of his guilt.

2. ———: QUALIFICATION OF JUROR.    A juror upon *voir dire* said: "I read an account of this matter in the papers, and came to the conclusion that defendant shot McNamara, and that it was a criminal thing for him to do.    *    *    *    *    I have not formed such an opinion of the guilt or innocence of the accused as would prevent me from rendering a true verdict."    *Held*, that the juror had not formed such an unqualified opinion as would render him incompetent.

3. ———: JURY: USE OF INTOXICATING LIQUORS. The use of intoxicating liquors by members of the jury pending the trial, and before the final submission of the case, in the absence of a showing that prejudice to the defendant resulted therefrom, will not vitiate the verdict.

4. **Practice:** TRIAL: ORDER OF TESTIMONY. The order in which testimony shall be introduced rests largely in the discretion of the trial court, and the exercise of that discretion will not be interfered with, save upon the clearest showing that it has been abused.

*Appeal from Lee District Court.*

FRIDAY, JUNE 7.

THE defendant was indicted for the murder of Michael McNamara. He was found guilty of murder in the first degree, and by the judgment of the court was sentenced to the penitentiary for life, from which judgment he appeals. The facts necessary to an understanding of the questions made appear in the opinion.

*Miller & Sons* and *Craig & Collier,* for appellant.

*J. F. McJunkin, Attorney General,* and *D. N. Sprague, District Attorney,* for the State.

ROTHROCK, J.—I. The defendant did not deny the homicide imputed to him, but rested his defense upon the ground of insanity at the time the alleged criminal act was committed. It was also urged that, if his mind was not so diseased as to entirely excuse him from the legal consequences of the act, yet he labored under such mental disorder as to reduce the offense to murder in the second degree, or manslaughter.

It appears, from the evidence, that the defendant and the deceased were well acquainted with each other, and had been on terms of friendship. On the morning of the day of the homicide the defendant, in passing the deceased's grocery store, asked him to cash a note. Deceased refused to do so, and said to defendant that he did not want him to say anything more to him about that note—that he wanted to hear

nothing more about it.   The defendant became very angry at the deceased, and went rapidly toward his home.   In a short time he returned to the deceased's grocery, and appeared to be looking for some one.   The deceased, at that time, was concealed in the cellar.   Defendant went away, and again returned to the grocery.   Deceased concealed himself under the counter.   He returned the third time, but did not find the deceased.   After these visits, the defendant was searched by the city marshal, who found a revolver upon his person, which he took from him, and a friend of the defendant conducted him to his home.   Afterward, the defendant left his home, went to a store, purchased a revolver and a box of cartridges, and went directly to the deceased's store and shot him with the revolver so purchased.   After shooting the deceased, the defendant ran up street, and went into the house of one Johnson, where he was found by the city marshal, in a closet up-stairs.   The marshal searched him, and found upon his person a revolver, a dirk-knife, and part of a box of cartridges.   The first meeting of the parties on that day was at about six o'clock in the morning.   The fatal shot was fired in the dusk of the evening.

We have detailed these undisputed facts to show that the circumstances attending the homicide were such that, if the defendant had sufficient mental capacity to be held criminally responsible for his acts, the crime was murder in the first degree.   It could not have been less.   The deliberation and the intent to kill were so manifest that, conceding the defendant to have been a responsible moral agent, his act was murder in the first degree.   And here we may as well remark that, as there was evidence tending to show that defendant was intoxicated from the use of spirituous liquors upon the day of the homicide, the circumstances attending the act so conclusively show that such intoxication, of itself, was not sufficient to deprive him of the power to deliberate upon the act, and form the criminal intent, that no jury would be justified in finding to the contrary.   Unless the

intoxication was so great as to deprive the defendant of the power to deliberate, and form the guilty intent, it was no excuse or palliation for the act. "For an act designedly perpetrated, although done when drunk, the law holds the perpetrator to the same responsibility as if done when sober." *People v. Hammill*, 2 Parker, 223.

The real inquiry upon this branch of the case is, was this homicide the deliberate act of a murderer—was it the act of a person of sound mind, or was it the offspring of a mind so diseased as to be incapable of determining the moral quality of the act, and refraining from its commission? The jury found the defendant guilty of murder in the first degree. Under the rule adopted in this State, and followed by the court below in the instructions to the jury upon the question of insanity, we think the verdict was fully supported by the evidence. We will make further reference to this rule presently. A discussion of the evidence in detail would serve no useful purpose.

II.   The defendant asked the following instruction, which was refused:

"In this case, where the defense of insanity is set up, it does not devolve upon the defendant to prove that he is insane by a preponderance of the evidence; but if, upon the whole of the evidence introduced on the trial, together with all the legal presumptions applicable to the case under the evidence, there should be a reasonable doubt as to whether the defendant is sane or insane, he must be acquitted."

1. CRIMINAL law: insanity.

The court instructed the jury upon this branch of the case as follows:

"25.   The plea of insanity is a complete excuse for the crime charged, if from all the evidence you believe the plea is sustained. The law presumes all men sane until insanity is established by competent evidence to the satisfaction of the jury.

"26.    It is not necessary, in order to acquit, that the evi-
dence on the subject of insanity should satisfy you beyond
all reasonable doubt that the defendant was insane; it is suffi-
cient if, upon consideration of all the evidence, you are
reasonably satisfied that he was insane. If weight or prepon-
derance of the testimony shows the insanity of the defendant,
it raises a reasonable doubt of guilt."

The rule of the instructions given by the court was the same
which was approved by this court in the case of *The State v.*
*Felter*, 32 Iowa, 49, and followed in the case of *State v.*
*Mewherter*, 46 Iowa, 88. We see no sufficient reason for
overruling these cases.

III.    Exceptions were taken to the twelfth and fourteenth
instructions given by the court to the jury. We need not repeat
these instructions. They embody the rule as to the degree
of insanity necessary to acquit, which was adopted by this
court in the case of *The State v. Felter*, 25 Iowa, 67, and with
that rule we are content.

IV.    Upon the impaneling of the jury, George Roberts
was called as a juror, and being sworn to answer
questions, testified as follows:

2. ——: quali-
fication of
juror.

"I read an account of this matter in the papers, at the time
it occurred, and came to the conclusion that defendant shot
McNamara, and that it was a criminal thing for him to do.
At the time I read it I thought it a horrible thing for him to
do. It created an impression on my mind. It was a criminal
thing for him to do so."

To the court and district attorney:

"Have no bias against defendant. Believe I can hear the
testimony, and fairly and without prejudice determine, on the
testimony now, the guilt or innocence of the defendant, irre-
spective of what I read in the papers. Have not formed such
an opinion of the guilt or innocence of the defendant as
would prevent me from rendering a true verdict."

Substantially the same testimony was given by others who
were called as jurors. The defendant "challenged each of

The State v. Bruce.

said jurors for cause, on the ground that the constitution of this State provides that each person tried for a public offense shall have an impartial jury, and the jurors challenged had prejudged the case."

The court overruled the challenges, and exceptions were taken by the defendant.

Counsel for appellant argue this point upon the theory that the jurors stated, in answer to questions propounded to them, that they had formed an unqualified opinion upon the guilt of the defendant. It will be seen that the juror did not state that he had formed such opinion.

The Revision of 1860, § 4771, provided that a challenge might be taken to any juror who had "formed or expressed an unqualified opinion or belief that the prisoner is guilty or not guilty of the offense charged." Counsel concedes that this section of the statute did not prevent a defendant from obtaining an impartial jury, although the jurors may have formed hypothetical opinions based upon what they had heard or read.

The Code, § 4405, provides that a juror may be challenged for "having formed or expressed such an opinion as to the guilt or innocence of the prisoner as would prevent him from rendering a true verdict upon the evidence submitted on the trial."

It cannot be claimed that this provision of the statute prevents a party from obtaining an impartial jury. If the statute be followed, it will exclude all partial, biased and prejudiced jurors, by selecting such as will render a true verdict on the evidence submitted on the trial.

These jurors all answered that they could hear the evidence and render an impartial verdict, without being biased or prejudiced by what they had heard or read in newspapers. It does not appear that any one of them had any personal knowledge of any fact connected with the case. Whatever opinion they had formed was based upon mere hearsay. Taking into consideration the character of the evi-

dence upon which the jurors formed such opinions as they had, together with their statements under oath that they could determine the guilt or innocence of the defendant upon the evidence submitted to them, irrespective of what they had heard or read, we think the court properly overruled the challenges.

That an opinion, however strong it may be, founded upon newspaper reports, or other hearsay evidence, will prevent a juror from rendering an impartial verdict, we do not believe. Men of sufficient intelligence and capacity to properly discharge the duties of jurors can certainly divest their minds of any opinion founded upon hearsay, and determine the guilt or innocence of the accused upon the evidence produced upon the trial, and on that alone. It would be a reproach upon the administration of justice to require jurors to be selected from that class of persons who do not or cannot read the current events of the day, and are totally ignorant of what is transpiring around them, or from that other class, if such there be, who, having read, have no opinion upon the subjects about which they read. See *State* v. *Lawrence*, 38 Iowa, 51.

V.  In the progress of the trial an order was made by the court that the jury should be kept together, and not allowed to separate. During the time they were thus required to be kept together, and before that time, certain jurors, at different times, drank intoxicating liquors during the adjournments of the court. The most of such drinking occurred between the adjournment on Saturday evening and the convening of court on Monday morning. No drinking of intoxicating liquors was indulged in by the jury while engaged in deliberating upon the case. It does not appear that any intoxication was produced by the drinks taken by any juror. On the contrary, certain affidavits which were taken show that the minds of such of the jurors as indulged in drinking were not affected thereby. It

3. ———:
jury: use of
intoxicating
liquors.

is claimed that the verdict should have been set aside for this misconduct of the jury.

The jurors may have been guilty of a contempt of the court for drinking intoxicating liquors as a beverage while they were required to be kept together, yet we do not think, in the absence of a showing of intoxication as the result of the drinking, that there should be a reversal of the judgment on this ground.

It was held, in *The State v. Baldy*, 17 Iowa, 39, and in *Ryan v. Harrow*, 27 Id., 494, that where jurors indulged in the use of intoxicating liquors after the cause was finally submitted to them, and while they were deliberating upon the case, it was such misconduct as vitiated the verdict, and the use of it in any degree was of itself conclusive evidence of prejudice to the unsuccessful party. We adhere to the rule announced in those cases.

In the case of *Van Buskirk v. Dougherty*, 44 Iowa, 42, it was held that where a juror drank intoxicating liquors during the adjournment of the court and before the cause was finally submitted to the jury, it was not error for the court to overrule a motion to set aside the verdict grounded upon such alleged misconduct, in the absence of a showing of intoxication or prejudice resulting from the indulgence.

There is a wide distinction between the duty of a juror during the adjournment of court pending the trial, and his duty after the case is submitted to him for his determination. Section 4435 of the Code requires that the court, upon an adjournment, must admonish the jury "that they should not converse among themselves on any subject connected with the trial, or form or express an opinion until the cause is finally submitted to them." This requires them to keep their minds in *statu quo*, so to speak, during the progress of the trial, so far as the merits of the case are concerned. If, during the adjournment of the court, they do no act which impairs the mind or clouds the understanding, when again called to

hear the evidence or arguments of counsel, we think it cannot be said there was misconduct to the prejudice of any one. When the cause has been finally submitted, the parties have the right to the calm, deliberate, and sober consideration of the jury, and any conduct which tends to impair this right may well be said to be prejudicial.

An examination of the numerous cases cited in argument has led us to the conclusion that when the indulgence in intoxicating drinks occurs during the adjournment, and before the cause is finally submitted to the jury, the better rule is, in the absence of a showing of prejudice, that the verdict should stand, and we think there is no good reason for making any distinction between civil and criminal causes in the application of the rule.

VI.   Exceptions were taken because the State was allowed, against defendant's objection, while upon the rebuttal, to introduce evidence in chief, and also to the refusal of the court to permit the defendant to introduce certain evidence.

1. PRACTICE: trial: order of testimony.

The order in which evidence is allowed to be introduced is a matter so much in the discretion of the court that we would not be justified in interfering, unless upon the clearest showing of prejudice, and we find none in this case.   The refusal of the court to allow defendant to introduce certain evidence was during what is denominated in the abstract as the "surrebuttal by defendant."   It appears to us that the evidence offered was evidence in chief, and this would justify the ruling of the court.

In conclusion, we cannot but admire the zeal and ability with which the learned senior counsel for the defendant has followed the fortunes of his client to the last, but we are of opinion that the appellant has had a fair and impartial trial, and that the judgment is just.

AFFIRMED.

ON REHEARING.

SEEVERS, J.—So much of the foregoing opinion as holds the verdict should not be set aside because the jury, or some of them, drank intoxicating liquors during the trial, but before the cause was finally submitted to them, has been sharply criticised in a petition for a rehearing.

The confidence seemingly exhibited by counsel has induced us to re-examine this question with the care its importance demands. If we understand counsel, it is claimed the decided weight of authority is against the rule of the opinion. This we regard as a grave error, into which counsel have fallen through perhaps commendable zeal for their client.

The rule of the opinion is sustained by *Van Buskirk v. Dougherty*, 44 Iowa, 42; *Wilson v. Abrahams*, 1 Hill, 207; *Purinton v. Humphreys*, 6 Maine, 329; *Davis v. The People*, 19 Ill., 73; *The State v. Upton*, 20 Mo., 397; *Stone v. The State*, 4 Humph., 27; *Thompson's Case*, 8 Gratt., 637; *Coleman v. Moody*, 4 Hen. and Mun., 1; and, if cider be classed as intoxicating, by *The Commonwealth v. Roby*, 12 Pick., 494.

In *The State v. Sparrow*, 3 Murphey, 487, and *Rowe v. State*, 11 Humph., 496, intoxicating liquors were drank by the jury after they had retired to consider of their verdicts. The verdicts were sustained.

In *Pope & Jackson v. The State*, 36 Miss., 121, and *Gilmanton v. Hann*, 38 N. H., 108, intoxicating liquor was drank by one of the jurors as a medicine, and the court refused to set aside the verdict.

In *The People v. Douglass*, 4 Cow., 26, the verdict was set aside because some of the jury drank such liquors during the trial and before the cause was finally submitted to them; and in *Brandt v. Fowler*, 7 Cow., 562, the jury, at the conclusion of the charge, were permitted by the court to go out before retiring to their room; during that time some of the jury drank intoxicating liquors and the verdict was set aside. This last case is overruled by the subsequent case of *Wilson*

*v. Abraham,* before cited, and, while the court attempts to distinguish *The People v. Douglass,* we regard it as an entire failure. The latter case should, we think, be also regarded as overruled, and such was our view in *Ryan v. Harrow,* 27 Iowa, 494, and it was so regarded in *Jones v. The State,* 13 Texas, 168.

In the following cases the verdicts were set aside because the jury, or some of them, drank intoxicating liquors after they had retired for the purpose of considering as to their verdict. The *State v. Baldy,* 17 Iowa, 39; *Ryan et al. v. Harrow et al.,* 27 Id., 494; *The State v. Bullard,* 16 N. H., 139; *Leighton v. Sargent,* 31 N. H., 119; *Jones v. The State,* 13 Texas, 168; and *Grigg v. McDaniel,* 4 Harrington, 367.

In *Dennison v. Collins,* 1 Cow., 111, the trial was suspended for two hours, and during that time, but not within one and a half hours of the time it was resumed, the jury drank intoxicating liquors. The verdict was sustained.

When called into the box, one of the jurors was intoxicated, and the court, on its own motion, directed him to stand aside. This was sustained on appeal. *Bullard v. Spoor,* 2 Cow., 430.

During the trial the jury drank spirituous liquors, and one of them was "disguised with liquor." The verdict was set aside. *Rose v. Smith,* 4 Cow., 17.

These last cases are somewhat exceptional, but they are in accord with the spirit and rule of the opinion.

We have examined and cited, we believe, all the cases to which our attention has been called, and it will be seen the opinion is in accord with the decided weight of authority.

In truth, there is not a single adjudicated case in which a contrary rule has been sanctioned, except the two overruled cases in Cowen. Nor will it do to say, in view of the citations we have made, that there is a distinction between civil and criminal cases.

No doubt there can be found, in some of the opinions, suggestions and illustrations used by way of argument, which,

at the first glance, seem to be opposed to the rule of the opinion. But all such must be regarded as *dicta*.

In view of the overwhelming weight of authority in support of the opinion, we deem it unnecessary to vindicate or support it by argument, which, however, we believe could be readily and satisfactorily done.

The petition for a rehearing is

OVERRULED.